IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 3, 2015 Session

## STATE OF TENNESSEE v. FREDRICK THOMAS

**Appeal from the Criminal Court for Shelby County
No. 12-00917      J. Robert Carter, Jr., Judge**

_____

**No. W2013-02762-CCA-R3-CD  -  Filed May 6, 2015**

_____

Defendant, Fredrick Thomas, was indicted by the Shelby County Grand Jury with first degree murder and employing a firearm during the commission of a felony after the shooting death of his wife and his unsuccessful attempt at suicide.  After a jury trial, Defendant was found guilty of first degree murder.  The trial court dismissed the remaining count.  Defendant was sentenced to life imprisonment.  On appeal, Defendant challenges the sufficiency of the evidence and the trial court's refusal to allow expert testimony on premeditation, deliberation, passion, and provocation.  After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

Paul J. Springer, Memphis, Tennessee, for the appellant, Fredrick Thomas.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; Karen Cook and Jeff Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### *Factual Background*

This is a direct appeal from Defendant's conviction in the Criminal Court of Shelby County for the first degree murder of his wife.

On November 8, 2011, Tiffany Thomas, the victim, was shot multiple times by Defendant, her husband. The couple's relationship was strained. They had been arguing for several months. In the months preceding her death, the victim spent several nights at the home of her adult son, Branden Johnson. Defendant moved out and was living with his mother. The couple's two minor daughters, S.T. and J.T.,[1] were living at 2479 Whitney with the victim. At the time, S.T. was ten years old and J.T. was seventeen.

On the afternoon of November 8, S.T. rode home from school with her mother, the victim. She immediately went to her bedroom to complete her homework. J.T. came home early from a basketball game and dinner with friends after receiving a telephone call from the victim. J.T. later explained that she "didn't have a good feeling" about the telephone call.

S.T. heard her father, Defendant, arrive. Defendant's white Corvette pulled into the driveway and blocked the victim's Nissan. Almost immediately after Defendant arrived, she heard "loud voices." J.T. saw Defendant come into the house and sit down on the loveseat. She recalled that the victim was sitting on the couch when the victim "asked him was he going to stay the night . . . and if he decided to stay, she was going to leave cause [sic] she didn't feel like arguing." The victim asked Defendant to move his car and asked him if she needed to call the police. Defendant told her to call the police. The victim got up from the couch with a phone and walked to the kitchen. Defendant "got up off the couch [removed his gun from his hip] and started to shoot." The victim tried to run to the front door but Defendant blocked her from leaving. In a panic, J.T. ran the other way, to S.T.'s room. Defendant was blocking the exit of the house.

J.T. heard Defendant say to the victim, "you're going to die and I am too." She saw Defendant shoot the victim in the corner of the bedroom while she and S.T. were trying to get out of the house through a small bedroom window. Both girls begged Defendant to stop shooting. When the girls could not get the window to open, they managed to get to J.T.'s bedroom and tried to escape through another window. They broke the window but were unable to get out because the window was too small. J.T. dropped her phone while she was trying to open one of the windows; the battery fell out of the phone. The two girls eventually managed to get out of the house through the carport door. J.T. then successfully managed to put the battery back in the phone in order to call the police. By that time, the police were already pulling up to the house.

J.T. knew at that point that Defendant shot the victim but did not know that she was dead. She thought that Defendant also shot himself after shooting the victim because she saw him being taken from the house on a stretcher. Neither J.T. nor S.T. saw

---

[1] Due to the age of the children at the time of the incident, we have chosen to refer to them by their initials to protect their identity.

Defendant again prior to trial. They did not see the victim again until her funeral, one day prior to S.T.'s eleventh birthday.

At trial, J.T. testified that Defendant and the victim had argued repeatedly in the months leading up to the shooting. She was asked if Defendant had confronted the victim with a receipt from a hotel. J.T. recalled an argument during which Defendant "pull[ed] up a piece of paper" but explained that she did not know what was on the piece of paper. The night of that particular argument, J.T. recalled that she, the victim, and her sister stayed at her older brother's home.

The 911 operator, Lawana Ivory, testified that she would "never forget" the call she received on November 8, 2011, from the victim. During the call, she could hear the victim screaming, children begging Defendant not to shoot, and what sounded like gunshots. Ms. Ivory estimated that she heard nine gunshots. Ms. Ivory dispatched officers as quickly as possible to the location of the call.

Officer Paul Petty of the Memphis Police Department arrived on the scene and entered the house through the open door from the carport. He saw a bullet hole in the living room and could smell a "strong odor of gunpowder." Defendant was found lying unresponsive on his back in the bed, with a Taurus .45 pistol in his right hand. The victim was lying on the floor nearby in a "crouching, fetal position." She was already deceased. Defendant was breathing and was transported via ambulance to the hospital.

A subsequent search of the residence revealed blood stains and two shell casings in the kitchen, a bullet hole in the wall of the den, a bullet hole near the bathroom doorway, and a bullet hole through the linen closet and the toilet in the bathroom. In the bedroom, there were three shell casings and a bullet hole in the wall.

Testimony at trial from a forensic specialist indicated that the spent bullets in the house and the victim's body were all fired from the gun found in Defendant's hand. Additionally, all of the shell casings found in the house were fired through the same weapon. The victim died from multiple gunshot wounds: one in the right chest wall, one in the right lower chest that entered the heart, one in the right forearm, and one in the outer right shoulder.

As part of his defense, Defendant attempted to introduce the testimony of Dr. Eric Engum, a clinical psychologist specializing in forensic and clinical neuropsychology. The trial court held a jury-out hearing on the proposed testimony, during which Dr. Engum testified that Defendant was competent to stand trial. Additionally, Dr. Engum reviewed Defendant's medical treatment along with statements of witnesses and family members. The doctor testified that his review of these items allowed him to make "inferences" about Defendant's psychological status at the time of the incident; however,

he was unable to reach a diagnosis regarding Defendant's mental state at the time of the incident. Dr. Engum opined that Defendant was "overwhelm[ed]" by events in his life and, as a result, "responded explosively towards his wife." He stated "this was a reasonable man [Defendant] who was pushed to a point where[,] as he saw it[,] his options diminished to the point that he had no other thing but to act in both an overtly aggressive manner towards his wife and an aggressive manner toward himself." The trial court ruled the testimony regarding Defendant's mental status prior to the shooting inadmissible on the basis of *State v. Hall*, 958 S.W.2d 679, 691 (Tenn. 1997). Additionally, the trial court ruled that any testimony by Dr. Engum with regard to voluntary manslaughter would be inadmissible under Tennessee Rule of Evidence 401 because it was an issue for the jury to decide.

Dr. Engum was permitted to testify about his evaluation of Defendant which was performed about a year-and-a-half after the self-inflicted gunshot wound. He described Defendant as "flattened, detached, dulled, [and] unemotional." He performed a variety of neurological and psychological testing on Defendant and came to the conclusion that he suffered from a "cognitive disorder not otherwise specified secondary to the traumatic brain injury." He also diagnosed Defendant with a "mood disorder" and depression.

The jury found Defendant guilty of first degree murder. The trial court dismissed the second count of the indictment, employment of a firearm during the commission of a dangerous felony. As a result of the conviction for first degree murder, Defendant was sentenced to life imprisonment.

Defendant filed a motion for new trial in which he argued that the evidence did not support the conviction for first degree murder and that the trial court erred in excluding the testimony of defense witness Dr. Engum, a clinical psychologist specializing in forensic and clinical neuropsychology. The trial court denied the motion and Defendant appealed.

*Analysis*

*A. Sufficiency of the Evidence*

Initially, Defendant insists that the evidence was insufficient to support the conviction for first degree murder. Specifically, Defendant points to eyewitness testimony that an "excessive heated arguing" between Defendant and the victim supported a conviction of voluntary manslaughter rather than first degree murder.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*,

838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is described as "[a] premeditated and intentional killing of another . . . ." T.C.A. § 39-13-202(a). Tennessee Code Annotated section 39-13-202(d) provides that:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

An intentional act requires that the person have the desire to engage in the conduct or cause the result. T.C.A. § 39-11-106(a)(18). Whether the evidence was sufficient depends entirely on whether the State was able to establish beyond a reasonable doubt the element of premeditation. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Premeditation may be proved by circumstantial evidence. *See, e.g.*, *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992). Whether premeditation is present is a question of fact for the jury, and it may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see also State*

*v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998).

Our supreme court has identified a number of circumstances from which the jury may infer premeditation: (1) the use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) the defendant's threats or declarations of intent to kill; (4) the defendant's procurement of a weapon; (5) any preparations to conceal the crime undertaken before the crime is committed; (6) destruction or secretion of evidence of the killing; and (7) a defendant's calmness immediately after the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *Pike*, 978 S.W.2d at 914-15. This list, however, is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done "after the exercise of reflection and judgment." T.C.A. § 39-13-202(d); *see Pike*, 978 S.W.2d at 914-15; *Bland*, 958 S.W.2d at 660. One well-regarded treatise states that premeditation may be inferred from events that occur before and at the time of the killing:

> Three categories of evidence are important for [the] purpose [of inferring premeditation]: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 Wayne R. LaFave, *Substantive Criminal Law* § 14.7(a) (2d ed. 2003); *State v. Berry*, 141 S.W.3d 549, 566 (Tenn. 2004).

We conclude that the evidence presented was sufficient to support the jury's findings that premeditation existed. The evidence presented at trial showed that Defendant and the victim had been unhappy in their relationship in the days and weeks leading up to their final argument. On the evening of the victim's death, Defendant and the victim got into an argument. Defendant told the victim that she should call the police and that they were both going to die. The victim hysterically called 911; the operator heard the victim scream and heard the children begging Defendant not to shoot their mother. Defendant took his gun from its holster and repeatedly shot the unarmed victim and then turned the gun on himself. When police arrived, Defendant was holding a weapon. Testing confirmed that this was indeed the gun that murdered the victim. The jury heard the evidence and chose to disregard Defendant's theory that the crime was borne out of passion. It was in their prerogative to do so. From this evidence, we

conclude that a reasonable jury could find premeditation. Consequently, Defendant's conviction for first degree murder is affirmed.

*Testimony of Dr. Engum*

Defendant complains that the trial court erred in refusing to allow Dr. Engum to testify regarding the "definitions of premeditation, deliberation, passion, and provocation" and that this error was not harmless. The State counters that the trial court properly applied the standard in *Hall*, 958 S.W.2d at 689, to limit the testimony of Dr. Engum

Ordinarily, expert testimony regarding a defendant's capacity or lack of capacity to form the mental state required for the commission of an offense is admissible if it satisfies "general relevancy standards as well as the evidentiary rules which specifically govern expert testimony." *Hall*, 958 S.W.2d at 689. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, even relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Further, Tennessee Rule of Evidence 702 requires that expert testimony "substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Rule 703 requires that the facts or data underlying the expert's opinion be trustworthy. A trial court's application of these rules to exclude expert testimony will not be reversed on appeal absent an abuse of discretion. *State v. Edison*, 9 S.W.3d 75, 77 (Tenn. 1999).

Under Tennessee law, evidence of a mental disease or defect that does not rise to the level of an insanity defense is nevertheless admissible to negate elements of specific intent. *State v. Phipps*, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). In *Hall*, our supreme court explained:

> [D]iminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense. Thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime actually committed. In other words, "diminished capacity" is actually a defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state.

958 S.W.2d at 688 (citations omitted). The testimony from the expert "should not be proffered as proof of 'diminished capacity.' Instead, such evidence should be presented

to the trial court as relevant to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried." *Id.* at 690. Thus, in order for expert testimony regarding a defendant's mental state to be admissible, the expert must testify that (1) the defendant has a mental disease or defect and that (2) because of the mental disease or defect, the defendant lacks the capacity to form the requisite mens rea. *See id.* at 689-91.

In *State v. Ferrell*, 277 S.W.3d 372 (Tenn. 2009), our supreme court clarified that the "decision in *Hall* established that the [mental health] testimony is properly admissible if it satisfies the relevancy and expert testimony provisions in the Tennessee Rules of Evidence and its content indicates that a defendant lacked the capacity to form the required mental state for an offense. . . ." *Id.* at 379. Our supreme court explained that the *Hall* holding "was based upon the broader legal principle that 'expert testimony relevant to negating intent is admissible in Tennessee even though diminished capacity is not a defense.'" *Id.* (quoting *Hall*, 958 S.W.2d at 691). To that end, "*Hall* recognized that a defendant may negate an element of the offense as a defense to the prosecution." *Id.* at 380.

In the case herein, during the jury-out hearing, Dr. Engum testified that Defendant was competent to stand trial. He explained that he attempted to ascertain Defendant's mental state at the time of the crime by examining medical records and reviewing statements of witnesses and family members. From this information, Dr. Engum could "infer" Defendant's psychological status at the time of the crime. He opined that Defendant was "overwhelm[ed]" with his own life and, as a result, he acted "explosively towards his wife." Dr. Engum could not conclude that Defendant was "incapable" of forming premeditation. Our discussion above makes clear that expert testimony regarding a defendant's mental state is relevant and admissible only to establish that, at the time of the crimes, the defendant lacked the capacity to premeditate. Because Dr. Engum's testimony did not do so, we conclude that the trial court did not err in finding that the testimony was inadmissible. Accordingly, we conclude the trial court did not abuse its discretion in this regard.

The trial court also prohibited Dr. Engum from testifying about whether Defendant's actions were performed in the heat of passion because his testimony was not relevant under Tennessee Rule of Evidence 401. We agree. Dr. Engum's assessment of Defendant's pre-injury mental state was not within his purview. He had no personal knowledge of Defendant's mental state, behavior, or relationship with his wife prior to the incident. The jury is charged with examining the evidence presented, assessing the credibility of the witnesses and the weight and value to be given to evidence, as well as resolving all factual issues. *Pruett*, 788 S.W.2d at 561. Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE